**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

v.                             Case No. 06-CR-20471-DT

LARRY GAVIN,

        Defendant.

_____/

**OPINION AND ORDER DENYING**
**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Pending before the court in this felon-in-possession case is Defendant Larry

Gavin's October 13, 2006 Motion to Suppress Evidence. In his motion, Defendant

argues that the arresting officers lacked reasonable suspicion to justify detaining him,

and that the court should suppress "all evidence and 'fruits' of the illegal stop." (Def.'s

Mot. Br. at 5.)  On November 9, 2006, the court conducted an evidentiary hearing on the

motion.  For the reasons stated below, the court finds that the officers had an articulable

basis to entertain a reasonable suspicion of criminal activity. The court will accordingly

deny Defendant's motion.

**I. BACKGROUND**

During the November 9, 2006 evidentiary hearing, Detroit Police Officers John

Mitchell, Shannon Salisbury and David Sanders testified.  The officers testified that on

August 18, 2006, they were sent on patrol in a semi-marked vehicle, and told to give

special attention to the Jefferson and Jefferson Court area by their supervisor because

of a narcotics complaint.  (Tr. at 5, 38, 65-66.)  Jefferson street is a one-block dead-end

street running north-south from East Jefferson, on which are situated several buildings. (*Id.* at 6-7, 39, 66.) Most of these buildings are houses that are now in a state variously described as vacant, abandoned, boarded up, etc. (*Id.*) At about fifteen minutes before one o'clock in the morning, the officers were driving eastbound on Jefferson Avenue, a major thoroughfare in east Detroit. (*Id.* at 10, 40, 68.) As they were passing Jefferson Court, they observed people standing on or near the street. (*Id.*) At least one man, possibly two, were standing on the street in front of 431 Jefferson Court near a parked car, a man was sitting or standing near the porch (which was very near the curb) and another parked car was several feet away on the opposite side of the court. (*Id.*) That car was running, and appeared to be occupied. (*Id.* at 10, 40, 42, 68.) The officers therefore decided to turn around and investigate. (*Id.* at 10, 40, 68.)

After the officers stopped their car in the middle of Jefferson Court, and identified themselves as police officers, Officer Mitchell approached Gavin, who was standing by an unoccupied parked car. (*Id.* at 11, 43, 49, 69.) Gavin complied with Officer Mitchell's request that Gavin come towards him and place his hands on the car. (*Id.* at 11-12, 45, 72.) Officer Mitchell testified that he made this request to enable him to pat Gavin down for officer safety because it was a high-narcotic area, and Officer Mitchell was afraid that Gavin might have a weapon. (*Id.* at 13-14.) Officer Mitchell then asked Gavin whether Gavin had "anything on you you're not supposed to have." (*Id.* at 12.) Gavin responded that he had a gun in his back, and Officer Mitchell recovered the weapon from Gavin's back waistband. (*Id.* at 13.) While Officer Mitchell was interacting

2

with Gavin, Officer Sanders approached the man on the porch and Officer Salisbury approached the running, parked car occupied by a white female. (*Id.* at 12, 50-51, 72-73.)

The officers testified that based on their extensive experience with narcotics arrests and familiarity with the area, they believed these individuals were engaged in narcotic activity because (1) the area was known for narcotic activity, (*id.* at 22, 68, 73); (2) they, through their supervisors, had received a specific citizen's complaint about narcotic activity on Jefferson Court, (*id.* at 21, 41, 65); (3) it was a quarter to one in the morning, (*id.* at 22, 40, 73); (4) the dilapidated houses the people were seen standing in front of were vacant, and vacant homes are notoriously used as drug houses, (*id.* at 23, 26, 41, 66); (5) there were no legitimate commercial establishments open at that time in the immediate vicinity, (*id.* at 26, 62, 74); and (6) the officers could not think of any legitimate reason that people would be loitering at that location and time, (*id.* at 28-29, 57, 73).

## II. STANDARD

In *Terry v. Ohio,* 392 U.S. 1 (1968), the Supreme Court held that a police officer can stop an individual for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest. Because the Fourth Amendment to the United States Constitution bars "unreasonable searches and seizures," an officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts," give rise to a suspicion or belief that criminal activity is taking place," to justify the stop. *Id.* at 27. "The officer must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" *United*

3

*States v. Harris*, 192 F.3d 580, 584 (6th Cir. 1999).  The reasonableness of the officer's belief is measured against an objective standard.  *Terry*, 392 at 22.  In finding reasonable suspicion, "the totality of the circumstances–the whole picture–must be taken into account."  *United States v. Cortez,* 449 U.S. 411, 417 (1981).

Additionally, a police officer may conduct a reasonable search, or frisk, for weapons when the officer has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether there is probable cause to arrest that individual for a crime.  *Id.* at 27.  "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence."  *Adams v. Williams,* 407 U.S. 143, 146 (1972).  Under the exclusionary rule, evidence seized during an unconstitutional search is inadmissible.  *Weeks v. United States*, 232 U.S. 383, 398 (1914).

### III.  DISCUSSION

In his motion to suppress, Defendant argues that the officers unjustifiably stopped him based on "a generalized fear of criminal activity and presence of suspect [sic] in a neighborhood known for drug activity."  (Def.'s Br. at 3.)  While it is true that, considered in isolation, a person's mere presence late at night in a high crime area does not constitute reasonable suspicion; however, these factors are at least "relevant to the reasonable suspicion calculus," and may "support the stop."  *United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006).  By contrast, at the November 9, 2006 evidentiary hearing, the officers testified to numerous factors of which they were aware, including–but certainly not limited to–the fact that Gavin was present in an area specifically known for suspected narcotics activity.  For the reasons stated below, the

4

court finds that Defendant's detention was reasonable because the officers had an objectively reasonable suspicion of criminal activity.

First, the officers' testimony was uncontradicted and is credited by the court. That testimony established that Jefferson Court was known generally for a high incidence of narcotics activity. (Tr. at 22, 68, 73.) Indeed, the officers were told to pay special attention to Jefferson Court during their patrol that night because of a recent complaint regarding narcotics activity. (*Id.* at 21, 41, 65.) Similar alerts had been issued previously for that street. (*Id.* at 67.) Although not sufficient in itself, "the reputation of an area for criminal activity is an articulable fact upon which a police officer may legitimately rely [in making a *Terry* stop]." *Watkins v. City of Southfield*, 221, F.3d 883, 888 (6th Cir. 2000) (quoting *United States v. Rickus*, 737 F.2d 360, 365 (3d Cir. 1984)).

The officers testified that Jefferson Court was not merely a street known for narcotics activity, but it was also one that was overwhelmingly abandoned. Both Officers Mitchell and Salisbury testified that they were familiar with that area and had been to Jefferson Court prior to August 18th. (Tr. at 9, 39.) Officer Sanders testified that he had been sent on a special attention to Jefferson Court prior to August 18, 2006 for narcotics trafficking. (*Id.* at 67.) From past experience, the officers reasonably believed that the houses on Jefferson Court were all abandoned with the exception of one at the north end of the street, far away from the Defendant's location. (*Id.* at 23-25, 41, 66-67.) Even as to that one house, the officers only surmised that it *might* be legitimately occupied. (*Id.*) Officer Sanders testified that he had actually been in some of the vacant dwellings before, and it appeared that nobody was living in them because

5

they were boarded up, the doors were kicked in and they had no usable furniture, electricity or gas going into the locations.  (*Id.* at 66-67.)

Officer Sanders further testified that the few commercial buildings on Jefferson Court did not appear to be operating because they were "[b]oarded up and burned."  (*Id.* at 67.)  Officer Salisbury testified that "[t]here was no other activity [on Jefferson Court] at that time.  It's a pretty desolate area."  (*Id.* at 46.)  Accordingly, the court rejects as utterly inconsistent with the evidence Defendant's argument that "this is not some vacant area in the city of Detroit."  (*Id.* at 62.)[1]

In fact, the court finds that Jefferson Court is a desolate, dilapidated, essentially vacant street, and the fact that there are some businesses or commercial buildings located somewhere on Jefferson Avenue, hundreds of feet or more away, is of no consequence. There is no evidence that any businesses were actually operating near the area of these abandoned houses at that time of night, such that might explain the presence of people legitimately being present on or near the street, perhaps walking to or from parked vehicles while patronizing such businesses. Defendant's argument to that effect is unsupported.

---

[1] Other arguments presented by Defendant, expressed in the course of questioning the officers, are similarly unsupported or irrelevant. One, suggesting that Defendant lived in the Jefferson Court area, was belied by the address Defendant later provided to the officers showing a residence in a different neighborhood three or four miles away. Another suggested that the presence of a white person in the parked car–a fact the officers noted as further supporting their initial inclination to believe that the situation involved narcotics trafficking–was of no consequence since Plaintiff was married to a white woman.  Not only was this "fact" provided by Defendant only in the form of a question and not through evidence, even if true it was a fact not available to the officers at the time they made their observations and drew their conclusions.

The fact that the officers reasonably believed the houses were abandoned is significant because Officer Mitchell testified that "[i]n my experience as a police officer, I've known most persons that sell narcotics sell narcotics out of vacant locations."  (*Id.* at 26.)  Officer Mitchell explained that people tend to sell narcotics out of abandoned buildings in part to make it difficult for the police to use the location to track down anyone involved.  (*Id.*)

The officers testified that it would not have been particularly suspicious for people to be on the street during August in an occupied neighborhood, or relaxing on the porch of an occupied home, even at that very late time of night. (*Id.* at 23.)  However, given that the buildings in question were vacant, the officers concluded that criminal activity was likely.  (*Id.*)  Officer Salisbury testified that "[w]e have a lot of squatters.  They go into the [vacant] house to smoke their crack.  Any time we've come into contact with people over there, they've been doing illegal activity."  (*Id.* at 47.)  Officer Salisbury testified that "squatting" or trespassing in, or even on the curtilage of, abandoned property in itself constitutes criminal activity.  (*Id.* at 55.)

The officers reasonably believed that there was no legitimate reason or explanation for people to be standing, or sitting in a parked car, in front of abandoned houses in an area known for narcotics activity at nearly one o'clock in the morning. Officer Salisbury specifically testified that, in her experience, she has never found that there was a non-criminal reason for people to be located in front of abandoned houses on an unoccupied street at that time of night.  (*Id.* at 57.)  The court "allows officers to draw on their own experience and specialized training to make inferences from and

7

deductions about the cumulative information available to them." *United States v. Arvizu*, 534 U.S., 266, 273 (2002).

The court finds that the testimony established specific facts to support an objectively reasonable suspicion of specific criminal activity. *See United States v. Clay*, 181 F. App'x 542, 544 (6th Cir. 2006) ("Therefore, based on the belief that the house was abandoned, the high crime area, the fact that [the defendants] stared at [the officer] during his drive and their rapid hand movements, [the officer] had reasonable suspicion to detain the vehicle."). The officers had previous experience with Jefferson Court and knew it to be an area where narcotics activity was common. They were instructed to give Jefferson Court specific attention during their patrol because of a recent narcotics-related citizen's complaint. When driving past the delapitated, mostly abandoned Jefferson Court at a quarter to one in the morning, the officers saw at least two individuals and a running car sitting parked at the curb. With neither occupied homes nor any open, legitimate businesses in the immediate vicinity, the officers had a reasonable suspicion that narcotics activity was afoot. It reasonably appeared that the occupant of the running, parked car was present to purchase drugs and that the men standing around nearby were there to facilitate the transaction or were otherwise potentially complicit. These facts, taken as a whole, were entirely sufficient to justify the stop.

Upon further reflection, the court's decision in this case is not as close a call as the court originally thought. This is not a situation in which officers searched people who were found in a "suspicious" situation or locale–but who are otherwise obeying the law–based only upon some unarticulated "hunch." *Terry* requires that an officer "must

8

have more than a hunch" to support his reasonable suspicion, but the officer needs

"considerably less than proof of wrongdoing by a preponderance of the evidence." *U.S.*

*v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000) (citing *United States v. Sokolow,* 490 U.S. 1,

7 (1989)); *Houston v. Clark County Sheriff,* 174 F.3d 809, 813 (6th Cir. 1999). Here the

officers observed impending or ongoing criminal activity, and acted reasonably on

considerably more than a hunch.

Finally, Defendant raises no specific challenge to the pat-down search as such,

but only to the factual basis for the officers' approach and temporary detention. A lawful

stop does not necessarily carry with it the authority to conduct a pat-down search. *Terry,*

392 U.S. at 27 ("[T]here must be a narrowly drawn authority to permit a reasonable

search for weapons for the protection of the police officer, where he has reason to

believe that he is dealing with an armed and dangerous individual, . . . ."). In order to

make a pat-down search legitimate, an officer must be able articulate specific facts that

would warrant "a reasonably prudent man in the circumstances . . . in the belief that his

safety or that of others was in danger." *Terry,* 392 U.S. at 27. Here, the court observes

that testimony clearly establishes the officers' knowledge, based on experience, that

narcotics trafficking commonly involves the possession of dangerous weapons. Where,

as here, officers had a objectively reasonable belief that narcotics trafficking activity was

going on, a pat-down search for the possible presence of such weapons was justified.

*Knowles v. Iowa,* 525 U.S. 113, 118 (1998) (citing *Terry,* 392 U.S. 1) (finding that a

pat-down search of detainees was justified by "reasonable suspicion that they may be

armed and dangerous").

9

**IV. CONCLUSION**

For the reasons stated above, IT IS ORDERED that "Defendant Gavin's Motion

to Suppress Evidence" [Dkt. # 11] is DENIED.


                                        S/Robert H. Cleland
                                        ROBERT H. CLELAND
                                        UNITED STATES DISTRICT JUDGE

Dated:  December 6, 2006

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, December 6, 2006, by electronic and/or ordinary mail.


                                        S/Lisa Wagner
                                        Case Manager and Deputy Clerk
                                        (313) 234-5522